574 F.2d 1131
 50 A.L.R.Fed. 833, 2 Fed. R. Evid. Serv. 980
 UNITED STATES of America, Appellee,
v.
Calvin W. WEST, Appellant (four cases).
UNITED STATES of America, Appellee,
v.
Floyd Lee DAVIS, Appellant (two cases).
UNITED STATES of America, Appellee,
v.
Joseph Lee DEMPSEY, Appellant.
 Nos. 76-1837 through 76-1843.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 14, 1977.
Decided Feb. 13, 1978.
 
 Robert L. Sondej, Portsmouth, Va. (Mattox, Sondej, Young & Whitlow, Portsmouth, Va., on brief), for appellant in 76-1840 and 76-1841.
 Paul M. Lipkin, Norfolk, Va. (Robert H. Anderson, Jr., Goldblatt, Lipkin, Cohen, Anderson & Jenkins, Norfolk, Va., on brief), for appellant in 76-1843.
 S. DeLacy Stith, Portsmouth, Va., for appellant in 76-1837, 76-1838, 76-1839 and 76-1842.
 Justin W. Williams, Asst. U. S. Atty., Alexandria, Va., Stephen Wainger, Asst. U. S. Atty., Norfolk, Va. (William B. Cummings, U. S. Atty., Alexandria, Va., on brief), for appellee in 76-1837 through 76-1843.
 Before HAYNSWORTH, Chief Judge, RUSSELL and WIDENER, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 Calvin W. West, Floyd Lee Davis and Joseph Lee Dempsey appeal their convictions for distributing heroin and possessing heroin with the intent to distribute it. The most significant question presented is whether the admission of the grand jury testimony of Michael Victor Brown, who was slain prior to trial, was permissible under Rule 804(b)(5) of the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment. We hold that it was.
 
 
 2
 The convictions challenged here are the product of an extensive Drug Enforcement Agency (DEA) investigation in which Brown played a vital role. Brown volunteered his assistance to the DEA while he was in jail on a drug charge and under a detainer for parole violation. He agreed to purchase heroin under police surveillance.
 
 
 3
 Each purchase was similar. Brown would contact West or Davis and arrange to purchase heroin. Twice the DEA monitored Brown's calls to West arranging heroin deals. It also monitored one phone call to Davis. On other occasions it seems that Brown simply notified the DEA that he had arranged a purchase.
 
 
 4
 Each time that the DEA agents received notice that Brown was about to make a purchase, they made arrangements for extensive surveillance. Before each purchase, DEA agents strip-searched Brown to make sure that he had no drugs, and they concealed a transmitter on him. They then searched his vehicle to be sure that it contained no drugs and gave Brown the money required for the anticipated purchase.
 
 
 5
 According to the government's evidence, on three occasions, Brown went to West, gave West money, and obtained heroin. Twice Brown went to Davis, gave Davis money and obtained heroin. On another occasion, Brown gave West money then accompanied him to meet Dempsey. West then gave Dempsey money and told Brown that they were to meet Dempsey at Griffin's home. Brown and West went to Griffin's home. Dempsey arrived, went to the open window of Brown's car and then entered Griffin's home and told Brown that everything was all right. Brown then returned to his car to find 30 capsules of heroin.
 
 
 6
 Each time, law enforcement officials observed Brown's movements and obtained photographs of Brown as he met with West and with Davis. After each transaction Brown returned to the DEA office and surrendered the heroin that he had purchased and any money remaining. Each time the agents searched Brown and his car to be sure that he retained no contraband. Agent Scott then discussed with Brown the events that had taken place and composed a detailed summary of what had occurred, which Brown read, corrected and signed. After one of the purchases Brown himself prepared a statement which Agent Scott revised before Brown read, corrected and signed it. Each time, Scott and Brown listened to the tapes from the body transmitter for audibility and voice identification. By reviewing the tapes with Brown, Scott independently became able to identify the voices of the defendants.
 
 
 7
 On March 8, 1976, the defendants and others were indicted by a grand jury, apparently without Brown's testimony. On March 16, Brown appeared before a grand jury and testified under oath regarding his knowledge of the drug traffic in Virginia's Tidewater area. The government attorney read the statements that Brown had signed and periodically asked Brown if they were correct.
 
 
 8
 As a result of his cooperation, Brown was released from jail, the pending drug charge against him was nol prossed, and the detainer for parole violation was lifted. The DEA also gave Brown $855 for his personal use so that he would not arouse suspicion and jeopardize his cover by being without funds immediately after supposedly selling a large amount of heroin.
 
 
 9
 On March 19 Brown was murdered in a manner suggestive of contract killers. Four bullets were fired into the back of his head while he was driving his car. According to the government, at least four potential government witnesses in this and related narcotics investigations have been murdered after they had agreed to cooperate. But these defendants have not been charged with Brown's murder, and the government did not offer any evidence to show that they were responsible for it.
 
 
 10
 On April 22, a week before the scheduled trial date, the government notified the defendants, pursuant to Rule 804(b)(5) of the Federal Rules of Evidence, that it intended to introduce Brown's grand jury testimony at trial. It agreed to give defense counsel all of its evidence, including Brown's arrest record, and transcripts of the tapes of Brown's conversations with the defendants.
 
 
 11
 After a pre-trial hearing, the district court ruled that the grand jury testimony was admissible under Rule 804(b)(5) because, under the circumstances, it was essential and trustworthy. It also gave the defense a week's continuance after it announced that it would admit Brown's grand jury testimony.
 
 
 12
 During the trial the government introduced the transcript of Brown's grand jury testimony, the photographs, an expert on voice identification and the heroin. It also played the tapes of Brown's conversations with the defendants. Law enforcement agents testified about their observation of Brown's activities and corroborated Brown's highly detailed grand jury testimony. The government sought to introduce transcripts which it had prepared from the tapes from Brown's body transmitter. Although the district judge found that the transcripts were a fair representation of the taped conversations, he permitted the jury to see the transcripts only while they listened to the tapes and instructed the jurors to decide for themselves what the tapes said.
 
 I.
 
 13
 The defendants contend that the district judge erred in concluding that the transcript of Brown's grand jury testimony was admissible under Rule 804(b)(5).
 
 Rule 804(b)(5) provides:
 
 14
 "(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 
 
 15
 "(5) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."
 
 
 16
 The defendants do not contend that the grand jury transcript fails to meet the criteria of clauses (A), (B) and (C). Instead, they focus upon the general requirement that the statement have "equivalent circumstantial guarantees of trustworthiness" as statements the admission of which is authorized by any of the preceding four paragraphs. They find a lack of trustworthiness in Brown's criminal record and their lack of any opportunity to cross-examine him. They point to legislative history indicating that Rule 804(b)(5) applies only where "exceptional circumstances" lend to the extra-judicial statement a degree of trustworthiness equivalent to that of evidence admissible under other § 804(b) exceptions.[1]
 
 
 17
 There were present very exceptional circumstances providing substantial guarantees of trustworthiness of Brown's grand jury testimony probably exceeding by far the substantial guarantees of trustworthiness of some of the other § 804(b) hearsay exceptions. Before each contact by Brown with West, Davis or Dempsey, the agents took elaborate steps to assure themselves that Brown possessed no drugs or money other than the money supplied by the agents to effect the purchases. Except when he entered a building and became concealed from their view he was under constant surveillance, and photographs were taken when he was with one of the defendants. Moreover, his transmitter was broadcasting his conversations with the defendants, and a tape recorder preserved those conversations. Moreover, immediately after each purchase, he and one of the agents reviewed what Brown had done, said and observed, and a statement of it was prepared and corrected. The immediate transcription and verification of Brown's statements provide an additional guarantee other admissible hearsay statements lack.[2] But the most impressive assurance of trustworthiness comes from the corroboration provided by the observations of the agents, the pictures they took and their recordings of the conversations. Brown had a criminal record, and he was seeking favors to avoid further incarceration, but the circumstances make deception of the agents inconceivable. The agents simply followed, photographed and recorded conversations to such an extent that deception by Brown was substantially impossible. Moreover, his interest in gaining favors to avoid further imprisonment gave him every incentive to be extremely accurate in his reports. He knew what the agents were doing to corroborate and verify his reports, and any attempted deception would only have been calculated to arouse the suspicion of the agents and to lose for Brown their favor.
 
 
 18
 The substantially contemporaneous sworn written statements by Brown were the basis of Brown's grand jury testimony. The corroborative circumstances and verification procedures lend to his grand jury testimony a degree of trustworthiness probably substantially exceeding that inherent in dying declarations, statements against interest, and statements of personal or family history, all of which are routinely admitted under § 804(b)(2), (3) and (4).
 
 
 19
 Although Brown's grand jury testimony was not subject to immediate cross-examination, to a large extent what Brown said was corroborated by the observations of the agents. The agents did appear as witnesses and were subject to cross-examination about what they observed, including the possibility of mistake or prevarication by Brown, and their own roles in preparing Brown's statements. Moreover, defense counsel had Brown's criminal record and knew of his interest in gaining favor with the agents. They could, and did, present those bases of impeachment of Brown which might have been developed on cross-examination if Brown had been present to testify.
 
 
 20
 Under all of these circumstances, the absence of an opportunity to cross-examine Brown himself is of considerable less significance than in those cases involving statements against interest, statements of family history, or dying declarations.
 
 
 21
 Whether the circumstantial guarantees of trustworthiness of Brown's grand jury testimony are equivalent to those which arise from cross or direct examination which underlies the former testimony exception of § 804(b)(1), we need not determine. In this unusual case, those guarantees were probably greater, but the equivalent guarantee of trustworthiness requirement of § 804(b)(5) is met if there is equivalency of any one of the preceding § 804(b) exceptions. Clearly there is such equivalency with the exceptions we find in paragraphs 2, 3, and 4.
 
 
 22
 The defense lawyers were given every opportunity to attack Brown's credibility, and they fully utilized their opportunities. It may be of passing significance that the jury did not accept all that Brown said, for it acquitted two of the defendants implicated by him. That it convicted West, Davis and Dempsey suggests that it carefully considered the very substantial extent to which the corroborative evidence established their guilt, either directly or through strong demonstration of the trustworthiness of Brown's testimony as to them.
 
 II.
 
 23
 The contention is earnestly advanced that even though Brown's grand jury testimony meets the requirements of § 804(b)(5) of the Federal Rules of Evidence, its admission was barred by the Confrontation Clause of the Sixth Amendment. That Clause provides "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."
 
 
 24
 The Supreme Court has consistently held that the Confrontation Clause itself does more than to require that the prosecution produce available witnesses for live testimony. It affirmatively requires the exclusion of extra-judicial statements which have no badges of reliability. Thus, we are required to make a separate determination, focusing upon the Confrontation Clause itself, whether Brown's grand jury testimony bore sufficient guarantees of reliability, Dutton v. Evans, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), or whether the circumstances provided the jury with sufficient bases to judge its trustworthiness. California v. Green, 399 U.S. 149, 161, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).
 
 
 25
 It has long been recognized that the Confrontation Clause does not preclude the admission in a criminal trial of all extra-judicial declarations. As long ago as 1892, the Supreme Court held in Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, that the Confrontation Clause does not require the exclusion in a criminal trial of a dying declaration, and it recognized that there are other analogous situations in which extra-judicial declarations might be allowable.[3] More recently, statements against penal interest have been held admissible,[4] and in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Supreme Court held that testimony at a preliminary hearing was admissible when the witness at trial suffered a loss of memory, since the preliminary hearing testimony had been subject to cross-examination. Testimony at an earlier trial of a witness unavailable at the time of the retrial is similarly admissible, Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972).
 
 
 26
 It is true that testimony of a witness at a preliminary hearing which was not at all subjected to cross-examination because the defendant had no lawyer present, constitutionally may not be admitted under the Confrontation Clause.[5] The Confrontation Clause also requires the exclusion of a confession implicating the defendant given to police by a witness who invoked his privilege against self incrimination to avoid testifying at the trial.[6] The confession was doubtless against the penal interest of the witness, but it was a confession given under potentially coercive circumstances which could not be adequately examined; they were not the spontaneous declarations made to friends and confederates which were held to be admissible under the Confrontation Clause in Dutton v. Evans.
 
 
 27
 The cases in the Supreme Court considering the application of the Confrontation Clause to the admission of previously recorded testimony have distinguished between testimony subject at the time to cross-examination and testimony which was not. When tested by cross-examination, the testimony gained some added measure of reliability and, even with a written record, the trier of fact is given some basis for judging the credibility of the testimony from the answers to the cross-examination. It is not as satisfactory as it is when the trier of fact can observe the demeanor of the witness, but evasive answers may still appear evasive on paper, and forthrightness can be evident in writing.
 
 
 28
 The Supreme Court has never intimated, however, that cross-examination is the only means by which prior recorded testimony may be qualified for admission under the Confrontation Clause. Just as surrounding circumstances may give assurance of reliability to dying declarations and to declarations against penal interest, so surrounding circumstances may give assurance of reliability to prior recorded testimony which was not subject at the time to cross-examination. They also may provide the trier of fact with firm bases for judging the credibility of the witness and the truthfulness of his testimony.[7]
 
 
 29
 Such circumstances are present in abundant measure here. We have canvassed them in considering the admissibility of the testimony under § 804(b)(5) of the Federal Rules of Evidence. The agents testified to their preparation of Brown for each contact with the defendants, to what they observed during their surveillance, to their recordings of Brown's conversations with the defendants and others, and the preparation of Brown's written and signed statements immediately after each event. Moreover, the jury listened to the tapes as well as the written statements, and the agents at the trial were subject to cross-examination about their testimony concerning what they did and what they observed. All of this lends a high degree of reliability and trustworthiness to Brown's testimony before the grand jury. It furnished the jury a firm basis for judging the truthfulness of what Brown said before the grand jury.
 
 
 30
 It should not be surprising that the same circumstances suffice to meet the requirements of § 804(b)(5) and of the Confrontation Clause. This is true of other exceptions to the hearsay rule which do not contravene the Confrontation Clause. The dying declaration and the declaration against penal interest have indicia of reliability which warrant their admission as exceptions to the hearsay rule while at the same time warranting their admission under the Confrontation Clause.
 
 
 31
 In the plurality opinion in Dutton, rejected hearsay declarations involved in earlier cases were characterized as "devastating" or "crucial". This has led to the supposition that the principle of Dutton applies only when the declaration is neither crucial nor devastating, see, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 192, 196 (1971); at least, the standard of reliability should be elevated as the adverse impact of an extra-judicial declaration increases. We, however, find no basis for applying such a rule. If the admission of the declaration is harmless, no problem is presented, but faithfulness to the constitutional principle demands the exclusion of all extra-judicial declarations having no substantial indicia of reliability if admission of the declaration would have some tendency to persuade the jury to a finding of guilt. A flexible standard of more or less indicia of reliability triggered by suppositions about the force of the impact of the particular evidence upon the jury could hardly provide a workable standard. Here, the indicia of reliability are great, but we reject the notion that small indications of reliability will suffice if the prejudicial effect of the declaration is supposed to be not great while preserving a stricter standard for the admission of declarations seemingly having a greater impact.
 
 
 32
 For these reasons, we find no error in the admission of Brown's grand jury testimony.
 
 III.
 
 33
 We find nothing meriting discussion in the remaining contentions.
 
 
 34
 The agent's testimony that Brown had dialed West's telephone number and the agent's identification of West's voice, which he learned to recognize from frequent review of the tapes, was sufficient authentication of the tape of October 30, 1975.
 
 
 35
 Nor did the trial judge abuse his discretion in permitting the jury to see transcripts of the taped conversations as the tapes were being played. The transcripts were fair, though the judge instructed the jurors to depend upon their own hearing of the tapes. United States v. Hall, 342 F.2d 849, 853 (4 Cir. 1965).
 
 
 36
 The evidence of the guilt of West and Davis was more than abundant; that of Dempsey's guilt was quite adequate.
 
 
 37
 AFFIRMED.
 
 WIDENER, Circuit Judge, dissenting:
 
 38
 I respectfully dissent.
 
 
 39
 * Initially, I believe that the majority errs in its estimation of the reliability of testimony taken before a grand jury and therefore not subject to cross-examination. In a recent opinion of this court, N.L.R.B. v. McClure Associates, Inc., 556 F.2d 725 (1977), we held that the affidavit of an individual who had no interest in the outcome of the proceedings, and was not an employee of the company, obtained by an agent of the National Labor Relations Board in the ordinary course of his investigation of an unfair labor practice charge, and offered against the Board by the company in its defense to the charge, did not have such equivalent circumstantial guarantees of trustworthiness as to allow its admission.[1] Accordingly, I do not agree that the guarantees of trustworthiness surrounding the grand jury testimony in this case are any greater and should not be held sufficient to allow its introduction into evidence under the residual exception to the hearsay rule. Certainly the rule of exclusion should be at least as broad in criminal as in civil proceedings.
 
 II
 
 40
 I raise again the objections I voiced in the dissent in United States v. Payne, 492 F.2d 449 (4th Cir. 1974). Here, as in that decision, the majority has confused the issues of the admissibility of hearsay and the right of a criminal defendant to be confronted by his accusers. While the two different rules of law may "stem from the same roots," they are by no means identical, but are closely akin.[2] Dutton v. Evans, 400 U.S. 74, at p. 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).
 
 
 41
 The majority's treatment of the confrontation clause again, as in Payne, reduces the constitutional provision to the status of a mere rule of evidence when, in fact, the clause was intended to regulate the procedure of a criminal trial by compelling the presence of the accuser before the jury and the defendant. The court concludes that because the grand jury testimony is reliable, the confrontation clause is not violated; that because the circumstances surrounding the testimony, including the corroboration of Brown's assertions by the federal agents, indicate that Brown may well have been truthful, the jury could assess his veracity in his absence. At root, then, of the majority's analysis is its conclusion that Brown indeed spoke the truth, that his testimony was reliable, being corroborated, and that, the jury having been presented with sufficient indications of Brown's sincerity, the defendant's right of confrontation was not abridged.
 
 
 42
 This analysis is, however, misplaced.[3] While it has been said "the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth determining process in criminal trials by assuring that 'the trier of fact (has) a satisfactory basis for evaluating the truth of the prior statement,' California v. Greene," Dutton v. Evans, 400 U.S. at p. 89, 91 S.Ct. at p. 220, the whole question is not, as the majority treats it, whether the testimony is in fact truthful; rather, the issue is whether there has been such "adequate 'confrontation' " as to satisfy the requirements of the Constitution's Sixth Amendment. Dutton, 400 U.S. at p. 97, 91 S.Ct. 210 (Harlan, J., concurring). Hence, we should not be lured by the possible reliability of out-of-court statements, important as that is in the consideration of the problem as a rule of evidence, away from the ultimate constitutional prescription, which is the regulation of trial procedure.
 
 
 43
 The majority opinion proves too much. With all its analysis of the surrounding indicia of the reliability of Brown's grand jury testimony, one conclusion is compelled: the introduction of the testimony was far from being harmless error.
 
 
 44
 The government, indeed, succeeded in presenting to the jury evidence full of danger to the accused, without incurring the risk of either a personal view of the declarant by the jury or a face-to-face encounter between the accuser and the accused before the jury, the ultimate arbiter in the contest of truth between the two. Instead, the jury merely heard read the testimony given in the proceedings of the grand jury, written on paper with that additional indicia of verity, and persuasive in its solemnity. In my opinion, this procedure cannot be described other than as trial by affidavit, the very practice against which the confrontation clause was designed to protect. "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (emphasis added).
 
 
 45
 Hence, the confrontation clause invokes a means of trial procedure which provides a minimal, or threshold, level of protection to the defendant. It expresses our constitutional condemnation of trial by affidavit and the concomitant conclusion that the accuser should appear, personaliter, in order that the jury might observe his demeanor and appearance in the crucible of courtroom confrontation. Historically, the rule required the presence of the accuser; later, the accused was extended, since the declarant was there, the right to cross-examine. Now, the constitutional requisites include both "the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." Barber v. Page, 390 U.S. 719, at p. 725, 88 S.Ct. 1318, at p. 1322, 20 L.Ed.2d 255 (1968). Thus, the essence of the confrontation clause is the judgment that, as a procedural requirement, the defendant is entitled, at the very least, to the presence of his accuser before him and the jury. In the absence of circumstances accepted by the Supreme Court as meeting the clause's requirements, I believe that the confrontation clause prescribes, at a minimum, the presence of the witness who would testify against the defendant.
 
 
 46
 I might have less objection had the majority taken a recognized exception, such as found in Mattox, and extended its reasoning to this case. The Mattox decision, which allows the use of a transcript of testimony from a former trial when the witness has since died, is firmly rooted in the ancient British statutes which form the historical foundation of the confrontation clause, such statutes making exception for the case of a dead witness.[4] Appreciating these historical roots, this court might have declared that the murder of a witness, whether his death be at the hands of the defendant or not, as here, allows the transcript of former grand jury testimony to be used in evidence. While such a rule might burden the defendant with the risk of the witness' safety, it at least would be true to the meaning and history of the constitutional provision.
 
 
 47
 However, the majority has not chosen to follow that alternative and, instead, I think mistakenly, equates the Constitution's regulation of procedure with the rules of evidence. And it fails to answer the most important question: did the defendant have an opportunity to confront Brown? Accordingly, the opinion dismisses, in a footnote, the defendant's reliance on United States v. Fiore, 443 F.2d 112 (2d Cir. 1971), because that opinion was decided before the adoption of the Federal Rules of Evidence and Rule 804(b)(5). But Fiore rejected the admission of grand jury testimony on alternative grounds: because it was hearsay and because its admission would violate the confrontation clause. 443 F.2d at p. 115. It is at once apparent the reasoning of the majority on that point is facially self defeating, for, while Congress may alter the law of hearsay, it may not change the confrontation clause. Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (Feb. Term 1803). Hence, on the constitutional issue, Fiore, by Judge Friendly, is still good law, and we find ourselves in conflict with the Second Circuit.
 
 
 48
 I see the use of Brown's grand jury testimony to be no more than the disreputable trial by affidavit, the very cause of the confrontation clause. Even assuming the murder of a witness might excuse the use of a transcript of his grand jury testimony, I would not go so far, for his accidental or otherwise natural death would compel the same result if the reasoning here is adopted. Grand jury proceedings are ex parte, with no right of cross-examination. The object of the proceedings is to gain an indictment upon a showing of probable cause; thus, there is not a full blown investigation into the truth, but, like a preliminary hearing, is "ordinarily a much less searching exploration into the merits of the case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." Barber v. Page, 390 U.S. at p. 725, 88 S.Ct. at p. 1322. Finally, we must recognize that a witness will often make accusations behind the back of the accused which he will not repeat to his face.
 
 
 49
 For these reasons, I would hold that the admission of the grand jury testimony violated the defendant's right to confront his accuser. Even assuming the murder of the witness might excuse the use of the transcript of his grand jury testimony, I would yet reserve that question for the time when the Supreme Court, in its efforts to equate the constitutional requirements of the confrontation clause with the rules of evidence, might squarely address that issue.
 
 
 
 [1]
 The defendants also rely upon United States v. Fiore, 443 F.2d 112 (2d Cir. 1971) in which it was held that grand jury testimony was inadmissible where the declarant was physically available but refused to take the oath and submit to meaningful cross-examination. Fiore is inapposite, for it was decided before the adoption of Rule 804(b)(5). Two cases decided after adoption of the rule have reached opposite results. Compare United States v. Carlson, 547 F.2d 1346 (8 Cir.) (admitting prior grand jury testimony under Rule 804(b)(5)) with United States v. Gonzalez, 559 F.2d 1271 (5th Cir. 1977) (testimony not admissible). Both courts focused for purposes of their analysis of the admissibility of the evidence under the F.R.Evid. on its reliability
 
 
 [2]
 See McCormick, Evidence, § 261 at 626 (2d Edition, 1972)
 
 
 [3]
 Mattox at 151, 13 S.Ct. 50
 
 
 [4]
 Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Though holding such declarations admissible, the Court, in Chambers v. Mississippi, was not concerned with the Confrontation Clause. At his trial, Chambers undertook to prove in his own defense that one McDonald, rather than he, fired the fatal shots. He sought to present McDonald as an adverse witness, but was prevented from doing so by an application of Mississippi's witness voucher rule. He then tendered three witnesses, close associates of McDonald's, who would have testified that, shortly after the slaying, McDonald had made spontaneous statements to each of them, separately, strongly implicating himself as the slayer. The testimony was rejected, for, while Mississippi recognized as an exception to the hearsay rule a statement against pecuniary or proprietary interest, it did not recognize as such an exception a statement against penal interest. The Supreme Court examined the indicia of trustworthiness surrounding these statements. These included their spontaneity, the fact that each was made in seeming confidence to a close associate, the fact that each tended to corroborate the other, the fact that there was an eyewitness to testify that McDonald fired the fatal shots, and the fact that McDonald was known to have owned a revolver similar to the one employed in the shooting. The conclusion was that the three declarations were shown to have been of sufficient trustworthiness that they were not only admissible, but their rejection was a denial of Chambers' due process right to a fair trial. The rejection of the testimony of those witnesses, coupled with the state's refusal to permit Chambers to cross-examine McDonald, who had repudiated a formal confession and asserted an alibi, resulted in the reversal of Chambers' conviction for want of a fair trial
 
 
 [5]
 Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). See Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)
 
 
 [6]
 Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)
 
 
 [7]
 Compare United States v. Rogers, 549 F.2d 490, 500 (8th Cir. 1976) (prior testimony of witness with memory lapse had sufficient indicia of reliability so that Confrontation Clause was not violated by admission) with U. S. v. Gonzalez, 559 F.2d 1271 (5th Cir. 1977) (grand jury testimony lacked surrounding indicia of reliability so that admission violated Confrontation Clause). Both the Rogers and Gonzalez courts acknowledged that the reliability of hearsay evidence in part determines whether admission of the evidence violates the Confrontation Clause. Each case must be examined on its own facts. We do not hold that all hearsay admissible under the 804(b)(5) exception to the rule against hearsay can be admitted without violation of the Confrontation Clause rights of a defendant. We hold only that analysis under both Rule 804(b)(5) and under the Confrontation Clause must begin by focusing on the reliability and trustworthiness of the challenged statement
 
 
 [1]
 The opinion refers to the consideration of admission under Federal Rule of Evidence 803(24) which is identical in text to 804(b)(5) upon which rests the majority's decision to allow the admission of the hearsay grand jury testimony into evidence. I see no difference of moment here in the equivalent guarantees of trustworthiness under the two rules just cited
 
 
 [2]
 "It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots. But this court has never equated the two, and we decline to do so now." Dutton, at p. 86, 91 S.Ct. at p. 218 (footnotes omitted)
 
 
 [3]
 The majority follows the path of the plurality opinion in Dutton which also looked to indicia of reliability rather than whether the defendant had been confronted
 
 
 [4]
 As discussed in Payne, the confrontation requirements of the Constitution seem to originate in the reaction to the treason trial of Sir Walter Raleigh. In his defense, Raleigh attempted to rely on statutes which required the presence and testimony of two witnesses in a trial for treason. Even though the statutes had been repealed, there are indications that popular sentiment in England remained toward requiring the proof of treason by two witnesses. See Bowen, The Lion and the Throne, p. 195. Thus, the statutes represented a first step in the development of the rule "requiring the personal production of those who had already made a statement upon oath." V Wigmore on Evidence (Chadbourne rev. 1974), § 1364, at p. 20. Those statutes, Stat. 5 Edw. 6, c. 12, § 22 and Stat. 1 & 2 Philip and Mary, c. 10, § 11, provided an exception to the two witness rule in the case of a deceased witness. For example, Stat. 5 Edw. read: "Which said accusers at the time of the arraignment of the party accused, if they be then living, shall be brought in person before the party so accused, and avow and maintain that which they have to say to prove him guilty. . . . " (Emphasis added)