UNITED STATES of America, Plaintiff,

v.

Donald A. TURNER, Defendant.

Crim. No. 78–80240.

United States District Court,
E. D. Michigan, S. D.

Dec. 8, 1978.

Christopher A. Andreoff, Asst. U. S. Atty., James K. Robinson, U. S. Atty., Detroit, Mich., for plaintiff.

Neil H. Fink, Detroit, Mich., for defendant.

MEMORANDUM OPINION AND ORDER

REGARDING

GOVERNMENT'S MOTION TO ADMIT INTO EVIDENCE SWORN WRITTEN STATEMENTS AND GRAND JURY TESTIMONY OF AN UNAVAILABLE WITNESS

JULIAN ABELE COOK, Jr., District Judge.

This case involves a ten-count Indictment arising out of an alleged international cocaine smuggling conspiracy. The Indictment, which was filed by the Grand Jury on May 16, 1978, named three Defendants: to wit, John Keith DeSmyter, Ronald L. Korman and Donald A. Turner (a Southfield, Michigan attorney).

This case was originally assigned to Judge Ralph B. Guy, Jr. of this District, who, on August 31, 1978, granted a Motion for Severance and Separate Trials as to each of the Defendants.

On September 11, 1978, the Defendant DeSmyter was dismissed under the Indictment because of his death (suicide) on or about July 7, 1978.

On October 10, 1978, a jury found the Defendant Korman guilty of three counts of the Indictment.

On November 1, 1978, an Order of Reassignment to this Court was issued by Judge Guy in accordance with a pre-planned Court-authorized case reassignment system.

On November 27, 1978, the Government filed a timely Motion to Admit Into Evidence Sworn Written Statements and Grand Jury Testimony of an Unavailable

Witness. The Motion seeks the admission of certain sworn written statements, as well as the Grand Jury testimony, of the now-deceased John Keith DeSmyter who implicated the Defendant Turner in the alleged international cocaine smuggling conspiracy. The Government based its Motion on Federal Rules of Evidence; to wit, Sections 804(b)(3) and 804(b)(5). The Defendant, upon his receipt of the Notice and Motion, filed a responsive pleading which, in substance, denied the validity of the Government's positions. Additionally, the Defendant asserts that, notwithstanding the applicability or inapplicability, of either Section under Rule 804, the admission of such evidence would violate his Sixth Amendment right to confront his accusers.

Extensive Hearings were conducted by this Court on December 5, 1978 and December 6, 1978, during which time the testimony of witnesses were presented, and documentary evidence was introduced, by both parties under Rule 104. The Hearings assumed the hybrid quality of (a) the Hearing of a Motion, (b) an Evidentiary Hearing, and (c) an appellate oral argument. This Court, in recognition of the importance of the issue, allocated two days to this Hearing in order to give each party the opportunity to fully present their respective positions.

The Government's first witness was Patrick Mueller of the Drug Enforcement Administration (DEA), who was, and continues to be, the agent in charge of this case. Much of Mueller's testimony related to his efforts to make an independent corroboration, and to establish the trustworthiness of DeSmyter's Grand Jury testimony and written statements which allegedly implicated the Defendant Turner's criminality. A synopsis of the Government's version of DeSmyter's written statements and Grand Jury testimony, as well as Mueller's independent corroboration, have been set forth in a document entitled "Supplemental Statement Re: Motion to Admit Into Evidence Sworn Written Statements and Grand Jury Testimony," which was filed with this Court on December 4, 1978. This Supplemental Statement is incorporated herein by reference. All of the Government's thirty-two exhibits were introduced into evidence through Mueller's testimony and/or by stipulation with defense counsel.

Drug Enforcement Administration Special Agent Lowell Miller (of Tampa, Florida) testified as to his (a) arrest of DeSmyter, and (b) conversations with DeSmyter in Florida regarding the alleged cocaine smuggling operation. Subsequent thereto, DeSmyter's original bond of $25,000.00 was reduced to $10,000.00, subject to his willingness to return to Detroit for a debriefing by D.E.A. agents.

The Defendant produced Carol Petsko who is an employee of the Defendant's law firm. The Defendant, through this first witness, sought to establish that his relationship with DeSmyter was only that of an attorney-client, and nothing more. The Defendant's second witness, Norman Transeth, a polygraph expert, was presented to this Court; however, following a side-bar conference, he was excused without the presentation of any testimony upon the record.

The Court notes from the outset that this Motion presents serious unresolved questions as to (a) the scope of Rules 804(b)(3) and 804(b)(5) which were adopted by the Congress on January 2, 1975, and (b) the interface of these newly adopted hearsay exceptions with the Constitution's Confrontation Clause.

In *United States v. McClendon,* 454 F.Supp. 960, 962 (W.D.Pa.1978), it is stated that "[t]he proper scope of 804(b)(3) hearsay exception is not a well settled area of the law. Because of its newness, the Courts and commentators have as yet not had the opportunity to examine its applicability in all possible situations." The original House version of the Rule included a sentence: "A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused, is not within this exception." The purpose of this sentence in the House version was to include the rule of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Report of Committee on the Judiciary, House of Rep-*

*resentatives,* 93rd Congress, 1st Session, Proposed Federal Rules of Evidence, No. 93–650, pp. 15–16 (1973), U.S.Code Cong. & Admin.News 1974, p. 7051. However, the coverage was to be broader than *Bruton. Communication to the Senate Judiciary Committee,* commenting on the Standing Committee on Rules of Practice and Procedure of the Judicial Conference of the United States and the Advisor Committee on Rules, p. 57 (May 22, 1974).

As the Defendant correctly pointed out during argument, the Senate deleted the sentence, not because they wanted to include all inculpatory statements within the hearsay exception, but because they did not want to codify Constitutional Rights within the Federal Rules of Evidence. *Committee on Judiciary, Senate,* 93rd Congress, Second Session, Report on Federal Rules of Evidence, No. 93–1277, pp. 20–21 (October 18, 1974).

Professor Weinstein asserts that the context of the final sentence's deletion by the Senate, that is, it was deleted because it was not needed, means that it should be treated as if it had been included. "When Congress added the final sentence to Rule 804(b)(3) it made this point clear. But it was dropped by Congress on the grounds that it was not needed. In context, this means that the rules should be interpreted to include this language." J. Weinstein, United States Rules of Evidence ¶ 804(b)(3) [03] at 804–93 [hereinafter Weinstein]. Under Weinstein's reading, only under the most unusual circumstances would an inculpatory statement be permitted, regardless as to the circumstances under which it was made (e. g., whether it was made to an acquaintance or to curry favor from the police).

However, the Advisory Committee's note to Rule 804 intimates that the *circumstances* under which the statement is made may be determinative as to when a statement admitting criminal guilt and implicating another party would be admissible. *See Weinstein* at 804–25. For example, if the circumstances indicate that this statement was made to curry favor with the police, then the statement should be excluded. By contrast, if the statement was made merely to an acquaintance, the statement would be more likely to be included.

The Advisory Committee expressly indicated that the rule was not written with the Sixth Amendment Confrontation problems in mind. We point this out because the Government indicated during oral argument that because of the promulgation of the Rules by the Supreme Court, it is unlikely there are any Confrontation problems with the new hearsay exceptions. The role of the Court in adjudicating Constitutional issues is a very different one from that which it assumes when promulgating rules in conjunction with the Congress. The Committee reiterated that distinction in its vote.

It is unclear as to whether Weinstein's reading of the history of the Rule, which relates to the exclusion of almost every statement made by a declarant which inculpates another person, has been adopted by any Court. *See United States v. White,* 553 F.2d 310, 313–14 & n.8 (2nd Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977).

Because the Court's holding here does not necessitate such a restrictive view of the Rule, the Court refrains from adopting it.

All of the cases dealing with a declarant who has "turned State's evidence" (whether ultimately admitted or not) begin by questioning the statement as one not necessarily being against penal interests because a guilty plea on a lesser charge, grand jury immunity, or even an attempt to curry favor from the Government would seem to be self-serving rather than disserving to the declarant. *United States v. Bailey,* 581 F.2d 341, 345 (3rd Cir. 1978); *United States v. Lilley,* 581 F.2d 182, 187–88 (8th Cir. 1978); *United States v. Gonzales,* 559 F.2d 1271, 1273 (5th Cir. 1978); *United States v. White,* 553 F.2d at 313; *United States v. Rogers,* 549 F.2d 490, 498 n.8 (8th Cir. 1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977); *United States v. McClendon,* 454 F.Supp. 960, 962 (W.D.Pa. 1978).

The purport of these cases is that when immunity, plea agreements or even currying favor with the law enforcement officials is involved, there is a substantial likelihood that the statement is self-serving and, thereby, unreliable. Consequently, such statements should be viewed with great scrutiny.

Some cases seem to suggest that in situations involving the statement of a declarant which exculpates the Defendant, there must be independent evidence corroborating the statement, i. e., showing its trustworthiness. *See United States v. Carlson*, 547 F.2d 1346, 1354 n.4 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

However, as the Government pointed out at the Hearing, the Rule indicates that the requirement of corroborative evidence indicating trustworthiness relates to the declarant's statements exculpating the Defendant. "No comparable provision exists with respect to statements made against penal interest that implicate others." *United States v. White*, 553 F.2d at 313–14 & n.8. Therefore, the inquiry as to admissibility is determined solely by whether the declarant's statement is, in fact, against interest which implicate a co-conspirator, confederate or co-defendant except in the rarest of circumstances. As mentioned earlier, this case does not require that the Court address this reading of the Rule.

■ Our inquiry comes down to whether DeSmyter made his written statement against his penal interests. DeSmyter was an experienced drug trafficker who knew the ins and outs of the world of cocaine importation. The very statement that the Government seeks to admit supports this conclusion. The Rule mandates that whether a statement is made against penal interest is determined by an objective test (i. e., whether "a reasonable man in his position would not have made the statement unless be believed it to be true.")

DeSmyter was arrested by D.E.A. Agents in Florida in April, 1978 after having arrived there to answer a State Grand Jury subpoena involving an investigation of marijuana importation. He knew that (a) Turner and Korman had been arrested, (b) Blanchard had "turned State's evidence" and (c) he had been indicted by the Detroit Grand Jury. He spent a week in jail in Florida and, as noted earlier, his bond was reduced from $25,000.00 to $10,000.00 in order that he go to Detroit for debriefing by Agent Mueller. Florida D.E.A. Agent Miller said he destroyed his notes as to what transacted during his meeting in Florida with DeSmyter. DeSmyter's statement of April 27, 1978, sought to be admitted here, was drawn up in long hand by Agent Mueller, typed by a D.E.A. secretary, and then signed by DeSmyter. The statement had a paragraph which reads, "I have agreed to testify before the Grand Jury and any other preceedings [sic] as to the above individuals and events for whatever considerations can be granted in my pending criminal case. At this time, I have been made no promises or offered any deals." On June 7, 1978, he read this paragraph to the Grand Jury. On June 8, 1978, he entered into a Rule 11 plea agreement relating to violations of the Controlled Substance Act, excluding the present criminal case.

■ Our evaluation of this evidence strongly suggests that DeSmyter was, in fact, currying favor with the Government for leniency. Agent Mueller testified to that effect before the Michigan Board of Tax Appeals in Korman's tax case. The Government argues that (a) there was no currying of favor because DeSmyter had received no express promises from the Government when he made the statement, (b) he was not "in custody" when he came to Detroit but rather came of his own free will, and (c) the Rule 11 Agreement did not relate to the instant indictment. These arguments seem to overlook the obvious. DeSmyter had been "found out" by the D.E.A. and he was trying to make the best out of his already very precarious situation. The fact that the Agreement does not specifically relate to the instant Indictment does not, in the judgment of this Court, detract from his trying to spend as little time in jail as possible. It was clearly in

DeSmyter's best interest, as evaluated by a reasonable person in his situation, to cooperate with the Government, make the statement and testify before the Grand Jury. Because this Court is of the opinion that the DeSmyter statement was not made against his penal interest, the Motion to Admit the Statement and Grand Jury Testimony pursuant to 804(b)(3), heretofore filed by the Government, shall be, and is, denied.

If the Grand Jury testimony and statement made by DeSmyter is not admissible under Rule 804(b)(3), then the Government submits that it should be admitted under the "catch-all" or "residual" hearsay exception 804(b)(5) (which has a counterpart in 803(24)).

It should be noted initially that the Rule provides, "a statement not specifically covered by any of the foregoing exceptions" preconditions its use. In *Lowery v. State of Maryland*, 401 F.Supp. 604, 608 (D.Md.1975), the Court stated, after rejecting an 804(b)(3) offering, "[i]t was the intent of Congress that this exception be used rarely and only in exceptional circumstances. Since statements such as [the declarant's] are covered by Rule 803(b)(3), the admissibility cannot be considered under 804(b)(5)." Although such a reading may well have value, it would appear most of our Appellate Courts have not read the Rule so disjunctively. *See, e. g., United States v. Montgomery*, 582 F.2d 514, 519–21 (10th Cir. 1978) (Holloway, J. concurring), *petition for cert. filed*, (U.S. Sept. 28, 1978) (No. 78–5491).

1. The *Bailey* footnote 7 reads:
   The committee noted that some leeway was provided for the courts by Rule 102, which could cover the anomalous situation calling for admission of hearsay not covered by an enumerated exception. Rule 102 states:
   These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined. The House Committee also stated that "if additional hearsay exceptions are to be created, they should be by amendments to the Rules, not on a case-by-case basis." H.R.Rep.No. 650,

In *United States v. Bailey*, 581 F.2d at 346–47, the Court outlined the legislative history of 804(b)(5).

The history of Rule 804(b)(5) and its counterpart, Rule 803(24), indicates a congressional intention that the rules have a narrow focus. The initial "residual" rule for the introduction of hearsay not covered by one of the specific exceptions to the hearsay rule was phrased by the Advisory Committee as follows:

> A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness.

56 F.R.D. 183, 322 (1972).

After the rules were submitted to Congress, the House Judiciary Committee removed from both Rules 803 and 804 the residual exceptions on the grounds that the rules added too much uncertainty to the law of evidence.[7][1] The Senate Judiciary Committee reinstated the deleted Advisory Committee residual exceptions in a modified form. S.Rep.No. 1277, 93d Cong., 2d Sess. (1974), reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 7051, 7056. The Senate Committee noted its fear that without residual rules of admissibility for hearsay in certain instances, the established exceptions would be tortured in order to allow reliable evidence to be introduced. Further, the new proposed residual rules were drafted to apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present.[8][2] The Senate Committee

93d Cong. 2d Sess (1973), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7051, 7079.

2. *Bailey* footnote 8 reads:
   The Committee cited as an appropriate example the case of *Dallas County v. Commercial Union Assoc. Co., Ltd.*, 286 F.2d 388 (5th Cir. 1961). In that case, the court allowed into evidence a copy of a newspaper article describing a fire in a county courthouse fifty years prior to the collapse of the courthouse tower. The insurer offered this evidence in order to show that certain charred wood found in the ruins might not have been the product of lightning striking the courthouse and causing its collapse, as the county contended. The article, however, would have supported the insurer's

further stated that the residual exceptions were to be used only rarely, and in exceptional circumstances. The Senate Report cautioned that "[t]he residual exceptions are not meant to authorize major judicial revisions of the hearsay rules, including its present exceptions."

The House-Senate Conference Committee agreed to include the Senate residual rule with further modifications. H.Conf.Rep. No. 1597, 93d Cong., 2d Sess. (1974), reprinted in [1974] U.S.Code Cong. & Admin.News pp. 7051, 7106. Representative Dennis, one of the floor managers of the Federal Rules of Evidence bill, stated in the House debate preceding passage of the bill, that the residual rules applied to situations "comparable to the ordinary hearsay exceptions." 120 Cong.Rec. 40894 (1974). In his view, the residual rule did not purport to accomplish much at all regarding expansion of traditional rules of evidence.[9] [3] Thus, in reviewing the admissibility of evidence under Rule 804(b)(5), we must keep in mind its limited scope as intended by Congress.

Weinstein questions the use of 804(b)(5) in any criminal context: He wrote "Probably the most controversial aspect of what was a controversial proposed rule was its extension to criminal cases . . . The wisdom of this extension has been questioned by a number of legal commentators who fear that overreaching the unscrupulous prosecutors could take advantage of such an exception to obtain unjustified convictions." Weinstein, Rule 804(b)(5) [2] at 804–109.

■ Although the holding here does not mandate the adoption of Weinstein's extreme position, the Court is, nevertheless, aware of the caution that must be exercised by the Court in prohibiting the residual

exception, created to cover rare and even strange factual situations not covered by the other Rules, to become a subterfuge. In his oral argument, the Defendant stressed that use of Rule 804(b)(5) in the criminal context was intended to give the Defendant additional protections. *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

■ Admission under 804(b)(5) requires the following be shown: (1) the declarant must be unavailable; (2) the statement must have circumstantial guarantees of trustworthiness equivalent to the first four exceptions in Rule 804(b); (3) the statement must be offered as evidence of a material fact; (4) the statement must be more probative on the point for which it is offered than any other evidence that the proponent reasonably can procure; (5) introduction of the statement must serve the interests of justice and the purposes of the Federal Rules; and (6) the proponent of the evidence to be offered must have given his adversary the notice required by the Rule. In this case, the primary conflict relates to whether there are circumstantial guarantees of trustworthiness equivalent to the other exceptions.

The Government places heavy emphasis on *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1977). They also cite *United States v. West*, 574 F.2d 1131, 1135 n.1 (4th Cir. 1978), indicating that the test of trustworthiness under *Carlson*, supra, and *United States v. Gonzales*, 559 F.2d 1271, (cited by the Defendant) is whether the proferred evidence is reliable.

For their briefs, and during the Hearing, both of the parties have focused upon reliability to determine whether the proferred evidence is trustworthy within the meaning of Rule 804(b)(5). The Government primar-

---

proposition that the tower collapsed because of deterioration and disrepair. In allowing the evidence to be admitted, the court considered the inconceivability of the unknown reporter fifty years previously writing about a fire if one had not in fact occurred. *See* S.Rep.No. 1277, 93d Cong. 2d Sess. (1974) *reprinted in* [1974] U.S.Code Cong. & Admin.News at 7065–66.

**3.** *Bailey* footnote 9 reads:

Representative Dennis, because of his role in Congressional consideration of the rules, would seem to be an "authoritative person" whose statements are entitled to some weight in evaluating the legislative intent in modifying the residual rules of hearsay. *See Ideal Farms, Inc. v. Benson*, 288 F.2d 608 (3d Cir. 1961) *cert. denied* 372 U.S. 965, 83 S.Ct. 1087, 10 L.Ed.2d 128 (1963).

ily argues such reliability can be established by evidence corroborating the declarant's statements. However, a recent case indicates that considerations other than reliability, as established by corroborative evidence or otherwise, is essential in determining if there exists trustworthiness within the meaning of the Rule.

The following *Bailey* quote indicates that trustworthiness is not determined by merely looking at corroborating facts, but also and more importantly, by looking at the circumstances in which the declarant made the statement. Such considerations may prove crucial in determining the proferred evidence's trustworthiness.

> *We do not feel that the trustworthiness of a statement offered pursuant to the rule should be analyzed solely on the basis of the facts corroborating the authenticity of the statement.* Since the rule is designed to come into play when there is a need for the evidence in order to ascertain the truth in a case, it would make little sense for a judge, in determining whether the hearsay is admissible, to examine only facts corroborating the substance of the declaration. Such an analysis in effect might increase the likelihood of admissibility when corroborating circumstances indicate a reduced need for the introduction of the hearsay statement. We do not believe that Congress intended that "trustworthiness" be analyzed in this manner. *Rather, the trustworthiness of a statement should be analyzed by evaluating not only the facts corroborating the veracity of the statement, but also the circumstances in which the declarant made the statement and the incentive he had to speak truthfully or falsely.* Further, consideration should be given to factors bearing on the reliability of the reporting of the hearsay by the witness.

*United States v. Bailey,* 581 F.2d at 349 (emphasis is supplied).

The Court went on to find:

> In this case, the circumstances under which Stewart [the declarant] provided his statement implicating Bailey [the de-

fendant] do not inspire confidence in its reliability. First, as we have discussed, the statement was made during negotiations for reduction of charges lodged against Stewart. Secondly, the statements were made in a face-to-face meeting with two FBI agents.

*Id.* at 350.

■ An argument can be made that *Bailey* is distinguishable from the Grand Jury testimony offered here because in *Bailey* the declarant was not under oath. However this of negligible significance in view of this Court's belief that DeSmyter attempted to curry favor with the Government. In *Bailey,* the declarant gave his statement *after pleading guilty* but before sentencing. However, in *Bailey,* the terms of the plea agreement were negotiated *after arrest.* The Court believes that it is extremely important to determine whether there was currying of favor *at the time that the statement was made.* As *Bailey* implies, the fact that the statement was made in face-to-face encounters with law enforcement officials and that an agreement between the declarant and the Government was forthcoming, sheds serious doubt upon putting confidence in the statement's reliability. In the present case, we know the statements were made in face-to-face encounters with the D.E.A. with the expectation that DeSmyter would receive future consideration from them for his cooperation.

It is not mentioned whether *Bailey* establishes a "strict rule" prohibiting introduction of any evidence under 804(b)(5) when there is a showing of suspect circumstances in which the declarant's statement was made, albeit it is strongly corroborated. The other alternative would be to weigh the suspect nature of the circumstances in which the statement was made against the strength of the corroborative evidence in determining trustworthiness. *Cf. Webb v. Havener,* 549 F.2d 1081, 1084–85 & nn.5 & 5a (6th Cir. 1977) (In *Webb,* the Court contemplated whether to adopt a "strict rule" excluding identifications made under unnecessarily suggestive line up procedures,

albeit there was not a substantial likelihood of misidentification from such procedures).[4] We do not need to adopt such a "strict rule" or even its alternative because we think that even under the test suggested by the Government that the statements of DeSmyter falls short of the trustworthiness mandated by the Rule.

The Government has attempted to establish reliability by bringing forth evidence corroborating DeSmyter's statement and Grand Jury testimony. The Government presents us with twenty-two (22) items which were in the Statement and/or the testimony, which it alleges were corroborated by independent evidence. The defense, in presenting its own evidence at the Hearing, and on cross-examination, attempted to undermine corroboration, primarily by showing that many corroborative facts were the products of (a) law enforcement officials' interpretation of neutral facts and (b) were due to possible nonfeasance of these officials. For example, DeSmyter, on April 24, 1978, told Agent Mueller that he had secreted a kilogram of ninety-two percent (92%) pure cocaine in a tree outside of Toledo, Ohio. Agent Mueller in his report indicated that DeSmyter told him this on April 25, 1978, and that they went and found the cocaine on that same day. In cross-examination, Mueller admitted that DeSmyter told him of the secreted cocaine on April 24, 1978 and that because he didn't believe DeSmyter initially, he and DeSmyter went to Toledo the next day.

Even if all of the corroborative evidence is accepted, the court is troubled that all of it goes to DeSmyter's veracity and none of it goes to the aspects of the statement and testimony incriminating Turner. The Government responds that corroboration of the incriminating portions of the proferred evidence was impossible because DeSmyter's discussions with Turner occurred prior to any investigation of Turner and were always transacted in private. The Government did attempt to show that an associate in Turner's law offices remembered DeSmyter coming there and speaking with Turner when Turner, according to the statement and testimony, sampled the cocaine in February. However, the witness could not pinpoint even the month in which this meeting occurred, and moreover, in no way knew if Turner and DeSmyter were speaking of cocaine or of the negotiable instruments case in which Turner was the attorney of record for DeSmyter in Florida.

Additionally, there is inherent inconsistency within DeSmyter's statements which came out during cross-examination. Agent Mueller testified that when he first interviewed DeSmyter on April 24, 1978, DeSmyter told him "Turner was in no way involved." Later, he recanted and implicated Turner. Even under the case most adamantly relied upon by the Government, *United States v. Carlson*, 547 F.2d at 1354, the failure to recant the incriminating statement is essential to finding reliability.

4. If the Court opted for a "strict rule" in this context, this Court would make a determination as to whether there existed suspect circumstances when the declarant made the statement. If the answer is yes, then the Court would stop the inquiry and hold the evidence inadmissible because of the suspect nature of the circumstances in which the statement was made would determine conclusively that the statement was untrustworthy within the meaning of the rule. That would be the finding notwithstanding the fact that there might be evidence corroborating the statement. If the answer is no, then this Court would consider the reliability of the evidence as determined by the strength of the corroboration in ascertaining trustworthiness.

Under the alternative approach, the Court would weigh the suspect nature of the circumstances under which the statement was made against the strength of the corroborative evidence. Which ever preponderated would determine admissibility.

Arguably, a "strict rule" might be inapposite here because the rationale for such a rule (i. e., deterrence of undesirable police conduct) is not blatantly involved in this case. Nevertheless, it should be noted that (a) the law enforcement officials have an integral role in the striking of agreements, (b) that important confrontation rights may be involved when 804(b)(5) is so utilized, and (c) that perhaps such rights are always involved, in every such use of 804(b)(5).

Accordingly, we think that even under *Carlson* the evidence would be inadmissible.[5]

■ There is one final reason the Court believes that 804(b)(5) should not be utilized in this case. Like *Bailey*, this case raises serious Sixth Amendment Confrontation problems. Because the Federal rules are new and because of a paucity of U.S. Supreme Court cases in this area, it is unclear what precisely is the interface between the hearsay exceptions (and especially the new exceptions) and the confrontation clause. Therefore, great caution should be taken in utilizing 804(b)(5).

As to how to proceed when Confrontation Clause problems come into purview, the *Bailey* court said:

> We also have grave doubts about the propriety of introducing Stewart's [the declarant's] confession in light of clause (C) of 804(b)(5), which requires that "the general purposes of [the Federal Rules of Evidence] and the interests of Justice will best be served by [the] admission of the statement into evidence." Although we do not reach the constitutional issue raised in this case, we are concerned with the relationship between the Confrontation Clause of the Sixth Amendment and the admissibility of this evidence under the Federal Rules of Evidence. In drafting the proposed rules submitted to Congress, the Advisory Committee provided leeway in order to insure that the rules did not collide with the Confrontation Clause. Thus, in analyzing the admissibility of evidence pursuant to Rule 804(b)(5), *a court should exercise its discretion in order to avoid potential conflicts between confrontation rights and this hearsay exception.*

The use of Stewart's confession at Bailey's trial raises difficult constitutional issues, and we have doubts whether, in light of the lack of cross-examination, the questionable reliability of the statement

on the record before us, and the devastating impact of the statement, admission of this statement could pass constitutional muster.

*United States v. Bailey*, 581 F.2d at 350–51 (emphasis is supplied).

This caution in addressing the constitutional question and in so reading 804(b)(5) is well placed and aptly applicable to our facts.

■ After hearing all of the testimony, and examining all of the documents, the Court has reached the following conclusions.

1. In this case there is a lack of an opportunity by the Defendant to conduct any cross-examination.

2. There is an acknowledgement by the Government that the statement, if admitted, would have a devastating effect.

3. The evidence is untrustworthy because of the context in which the statement was made and in which the testimony was given.

4. There is a finding that this evidence is unreliable in view of the fact that the corroborative evidence only goes to non-incriminating portions of the statement and testimony.

5. There are inherent inconsistencies as to that very statement.

In view of all this, it is doubtful that the admission of this evidence could pass Constitutional minimum standards, and, accordingly, this Court would read Rule 804(b)(5) to prohibit the admission of the statements which have been proferred by the Government. The Motion to Admit the Statement and Grand Jury Testimony pursuant to Rule 804(b)(5), heretofore filed by the Government, shall be, and is, denied. It is so ordered.

---

5. The Court notes also that the affirmance of the District Court's finding the Grand Jury testimony admissible in *Carlson* was not based on

the finding being without error but that it was not an abuse of 804(b)(5) discretion.