**UNITED STATES of America, Plaintiff,**

v.

**Manuel VIGOA, Wilfredo Torres, and Roy Montesinos, Defendants.**

Crim. A. No. 86–249.

United States District Court, D. New Jersey.

March 27, 1987.

Matthew Fishbein, Sp. Asst. U.S. Atty., Office of the U.S. Atty., Brooklyn, N.Y., for U.S.

Linda George, Testorini, LeRoy & George, Newark, N.J., for defendant, Roy Montesinos.

Lawrence Lustberg, U.S. Public Defender, Office of the Federal Public Defender, Newark, N.J., for defendant, Wilfredo Torres.

Alan Silber, New York City, for defendant, Manuel Vigoa.

## AMENDED OPINION

SAROKIN, District Judge.

This matter is before the court on the government's application to admit the grand jury testimony of Orestes Rodriguez, a recently deceased government witness, into evidence at trial. For the reasons set forth below, the court concludes that admission of the grand jury testimony would violate both the Federal Rules of Evidence and the Confrontation Clause.[1]

## BACKGROUND

On May 22, 1986, pursuant to a cooperation agreement with the government, Orestes Rodriguez testified before a Brooklyn grand jury concerning Manuel Vigoa's participation in a cocaine importation scheme. Mr. Rodriguez, owner of the Alpha Auto Salvage yard in Newark, described how he was contacted by Manuel Vigoa in March of 1986 and offered $40,000 to assist in the delivery of a 20 foot sea container bearing 700 kilograms of cocaine in a secret compartment.

Rodriguez further testified that after the container arrived in his salvage yard, Vigoa met Rodriguez in a bar in Newark on March 21, 1986 and told him that he and the "people from New York" would come

---

1. The court originally issued its opinion on March 6, 1987. The government subsequently filed a Motion for Reconsideration returnable March 23, 1987. This amended opinion incorporates the court's response to the issues raised on the reconsideration motion.

to the salvage yard in a van the next day to unload the container. According to Rodriguez, Vigoa requested that he obtain a torch for use in freeing the cocaine stored behind a camouflaged wall in the container.

Finally, Rodriguez testified that Vigoa and three other people arrived at the salvage yard on March 22, 1986 in a van and a car. Rodriguez described how they opened and began unloading the container. Yet, before the container had been unloaded, FBI agents appeared at the salvage yard and began questioning the defendants.

On October 18, 1986 Orestes Rodriguez died. According to the government, Rodriguez was the only witness with direct knowledge of Vigoa's role in planning the delivery of the cocaine. Rodriguez's grand jury testimony is the government's most probative piece of evidence regarding Vigoa's participation in the cocaine importation scheme.

## DISCUSSION

Two distinct analyses are required here. First, is the witness' grand jury testimony admissible under the Rules of Evidence, and if so, does its admission violate the Confrontation Clause? The Supreme Court has made clear that while the hearsay rule and Confrontation Clause "stem from the same roots", *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), and "are generally designed to protect similar values", *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), their reach is not coextensive. *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 1126 n. 5, 89 L.Ed.2d 390 (1986); *United States v. Medico*, 557 F.2d 309, 314 n. 4 (2nd Cir. 1977).

### I. *Federal Rules of Evidence*

#### A. *Admissibility under Rule 804(b)(5)*

The government takes the position that Rodriguez's testimony falls within the established "residual" exception to the hearsay rule, Federal Rule of Evidence 804(b)(5). Rule 804(b)(5) provides that "[a] statement not specifically covered" by any of the other Rule 804(b) exceptions governing admissibility of statements by unavailable declarants, may be admitted if the proffered statement has "circumstantial guarantees of trustworthiness" equivalent to those other exceptions.[2] In addition the proffered statement must meet the following requirements:

> (5) ... (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will be served by admission of the statement into evidence.[3]

A number of circuits have read Rule 804(b)(5) to permit the admission of grand jury testimony. *See e.g. United States v. Murphy*, 696 F.2d 282 (4th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *United States v. West*, 574 F.2d 1131 (4th Cir.1978); *United States v. Barlow*, 693 F.2d 954 (6th Cir. 1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *United States v. Boulahanis*, 677 F.2d 586 (7th Cir.1982), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982); *United States v. Carlson*, 547 F.2d 1346 (8th Cir. 1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

In each case, the decision to admit was based on an exhaustive factual analysis; the court scrutinizing the circumstances surrounding the testimony to determine whether sufficient guarantees of trustworthiness existed. For example, in *United States v. West, supra*, the declarant, working with the DEA in a heroin distribution case, purchased heroin while under police surveillance and equipped with a body transmitter broadcasting his conversations

---

**2.** The enumerated hearsay exceptions are 804(b)(1) former testimony; 804(b)(2) dying declarations; 804(b)(3) statements against interest, and 804(b)(4) statements of personal or family history.

**3.** Rule 804(b)(5) also conditions admission upon the declarant being "unavailable" and the proponent giving advance notice to the adverse party of his intention to offer the statement. In this case Orestes Rodriguez is clearly unavailable and the government gave timely notice of its intention to move for admission of his grand jury testimony.

with the defendants. Each purchase was immediately recorded in a contemporaneous DEA writing that declarant reviewed and signed. Declarant testified to the details of the transactions and verified the accuracy of the written statements before a grand jury. Subsequently, declarant was murdered prior to testifying at trial. The Fourth Circuit, upholding the decision to admit declarant's grand jury testimony, relied on "the observations of the agents, the pictures they took and their recordings of the conversations" as establishing exceptionally sound guarantees of trustworthiness, particularly in light of the fact that the constant surveillance made deception impossible.

Later in *United States v. Garner, supra,* the Fourth Circuit expanded its reading of Rule 804(b)(5), permitting admission of grand jury testimony even in the absence of agents' surveillance, tape recordings, or contemporaneous signed statements. In *Garner* the co-defendant/declarant, after entering into a plea agreement and testifying before a grand jury in considerable detail about defendant's importation of heroin from Europe, refused to testify at trial. Upholding the admission of the declarant's testimony, the Fourth Circuit held that testimony by another unindicted co-conspirator corroborating declarant's account of one particular European trip to procure heroin, and the existence of extensive travel documentation confirming declarant's testimony, provided "strong indicators of reliability".

Similarly, the Eighth Circuit in *United States v. Carlson, supra,* held a grand jury transcript admissible under Rule 804(b)(5) despite the lack of corroborating tapes or surveillance. The court noted that the grand testimony had strong indicia of reliability because: (1) it was given under oath, thereby subjecting declarant to the penalties of perjury for false statements, (2) related facts of which the declarant had first-hand knowledge; and (3) was never recanted.[4] In addition, the court was greatly influenced by the fact that declar-

ant's testimony was "necessary" since declarant was the only government witness who could establish defendant's participation in the cocaine distribution.

However, in *United States v. Gonzalez,* 559 F.2d 1271 (5th Cir.1977), the Fifth Circuit refused to admit grand jury testimony under Rule 804(b)(5). The grand jury witness, a previously-convicted co-conspirator, implicated the defendant in a marijuana importation scheme, but later refused to testify at trial fearing physical reprisal by the defendant against himself and his family. The *Gonzalez* court placed less faith in the reliability of grand jury testimony than the *Carlson* court.

In refusing to admit declarant's statements, the Fifth Circuit pointed to numerous factors undermining the reliability of grand jury testimony. For example the court noted that: (1) a declarant is under enormous "pressure" from the prosecutor and members of the grand jury to "come up with answers"; (2) leading questions asked in a grand jury setting would not be permissible at trial, "on the rationale that they might possibly distort the truth of the answers"; (3) the testimony is not cross-examined, or otherwise probed, but rather accepted at first telling even if not supported by detailed facts. *Id.* at 1273. Given the subject matter of the evidence, and its potential to incriminate defendant, the court required a showing of trustworthiness beyond the mere recitation of a grand jury oath.

Likewise the Sixth Circuit in *United States v. Barlow, supra,* though finding the grand jury testimony admissible on the particular facts of that case, held that where the testimony provided "direct evidence of guilt or critical proof of guilt", substantial corroborating evidence, beyond the grand jury setting, must "weigh heavily in favor of admissibility" before such testimony may properly be admitted under Rule 804(b)(5). *Id.* at 962.

While the Third Circuit has never explicitly addressed the problem of the admissi-

---

**4.** In *Carlson,* a grand jury witness, who had testified about his previous drug transactions with the defendant, refused to testify at trial because of threats by the defendant. While

refusing to testify at trial, the declarant specifically stated at the time of trial that he told the truth to the grand jury.

bility of grand jury testimony under Rule 804(b)(5), the Third Circuit, in *dicta,* has endorsed a narrow application of the Rule. *See United States v. Bailey,* 581 F.2d 341 (3rd Cir.1978); *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 302 (3rd Cir.1983), *rev'd on other grounds* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In *United States v. Bailey, supra,* the Third Circuit read the legislative history underlying Rule 804(b)(5) as requiring the Rule "to be used only rarely, and in exceptional circumstances". Quoting the Report of the Senate Judiciary Committee that "[t]he residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions", the Third Circuit has concluded that "in reviewing the admissibility of evidence under Rule 804(b)(5), we must keep in mind its limited scope as intended by Congress". *Id.* at 347, quoting S.Rep. No. 1277, 93rd Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974, p. 7051. Furthermore, the Third Circuit has warned that "in analyzing the admissibility of evidence pursuant to Rule 804(b)(5), a court should exercise its discretion in order to avoid potential conflicts between confrontation rights and this hearsay exception". *Id.* at 350.

This court begins its analysis by questioning the validity of ever admitting grand jury testimony under the "residual" or "catchall" Rule 804(b)(5) exception.

■ The purpose of Rule 804(b)(5) as drafted is to enable a court, in its discretion, to admit otherwise excludable hearsay arising under such exceptional circumstances that it has not been anticipated by any of the four enumerated 804(b) exceptions. The language of Rule 804(b)(5) explicitly limits its availability to hearsay *"not specifically covered"* by any of the other 804(b) exceptions. (emphasis added). Thus, in order to establish the applicability of Rule 804(b)(5), courts must first determine whether the proffered hearsay is of a type already "covered" or contemplated by the specific exceptions. Where the proffered evidence is covered by a specific hearsay exception, it cannot qualify for admission under the residual exception but must be admissible, if at all, in accordance with the conditions of the specific exception.

■ It is undisputed that grand jury testimony constitutes "former testimony" as contemplated by Rule 804(b)(1). Consequently, grand jury testimony cannot be qualified for admission under the residual exception 804(b)(5) but must be subject to scrutiny under the requirements of 804(b)(1).

This conclusion is not altered by the fact that grand jury testimony is inadmissible under 804(b)(1) which expressly prohibits use of former testimony against a criminal defendant who did not have the opportunity to examine the witness at the grand jury proceeding. "[N]either the Advisory Committee nor the Senate Judiciary Committee intended that the residual exceptions be used to qualify for admission evidence which is of a type covered by a specific exception, but which narrowly fails to meet the standards of the specific rule". *Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1190, 1263–4 (E.D.Pa.1980), appealed on other grounds 631 F.2d 1069 (3rd Cir.1980), rev'd on other grounds and remanded 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[W]here there is a specific hearsay exception applicable to a clearly defined category of evidence such as former testimony, but the evidence fails to satisfy the requirements of the specific exception, the evidence should not be admitted under the residual exception. Thus if the former testimony is admissible, it must be under Rule 804(b)(1) and not Rule 804(b)(5)". *Creamer v. General Teamsters Local Union 326,* 560 F.Supp. 495, 498 (D.Del.1983).

The government asks this court to reconsider its reading of the "not specifically covered" language contained in Rule 804(b)(5).[5] Urging a more expansive read-

5. In support of its motion for reconsideration, the government argues that this court's *per se* rule "would produce endless litigation" devoted to the determination of whether proffered hear-

say was of a type specifically contemplated by the enumerated 804(b) exceptions. *See* Government's Memorandum in Support of the Motion for Reconsideration at 6. For example, the

ing of 804(b)(5), the government suggests that 804(b)(5) permits the revival of any evidence excluded under the other exceptions but which, upon careful scrutiny, demonstrates exceptional guarantees of trustworthiness and reliability. The government asserts that evidence "not specifically covered" by the enumerated exceptions is simply evidence "not admissible" under those exceptions. According to the government, any evidence not admissible under the enumerated 804(b) exceptions, even evidence of a type specifically contemplated and rejected by one of these exceptions such as grand jury testimony, may receive a "second look" under the residual exception, and if sufficient guarantees of trustworthiness exist, may be admitted pursuant to 804(b)(5). The court disagrees.

Rule 804(b)(1) provides that former testimony is admissible only where the declarant's: "[t]estimony [was] given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, *if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination"*. (emphasis added).

 By conditioning admission upon proof that the party against whose interest the testimony is offered was adequately represented during the development of the testimony, Rule 804(b)(1) incorporates considerations of adversarial fairness into the evidentiary analysis. Where the opponent had no role whatsoever in developing the former testimony, Rule 804(b)(1) expressly provides that it is unfair to admit that evidence. The legislative history of the former testimony exception indicates that the interest in fairness in this situation eclipses even considerations of accuracy which might otherwise favor admissibility.[6]

Rule 804(b)(1)'s fairness considerations require the exclusion of grand jury testimony against a defendant who had no opportunity to participate in the development of that evidence; particularly where, as here, the proffered testimony is the most probative piece of incriminatory evidence. To then admit this same grand jury testimony under the residual exception renders meaningless Rule 804(b)(1)'s fairness considerations.

Rule 804(b)(5) directs that the residual exception shall not be used except in furtherance of the "general purposes of these rules [of evidence]". Yet, if we allow the residual exception to relax Rule 804(b)(1)'s fairness inquiry and admit "trustworthy" grand jury testimony under Rule 804(b)(5), we have allowed the residual exception to subvert 804(b)(1)'s purpose.[7] "[W]herever a potential use of hearsay was specifically contemplated and consciously rejected in the Rules' overall design, it would pervert Congress' plan if the residual exceptions were allowed to resurrect that rejected class of hearsay and render it admissible in derogation of its intended exclusion elsewhere in the hearsay rules." Weissenber-

---

government asks whether a witness' signed statement or an oral statement recorded in an agent's report constitute former testimony specifically covered by Rule 804(b)(1) or whether they may be qualified for admission under the residual exception, Rule 804(b)(5).

Without passing on the merits of this "slippery slope" argument, this court notes that its ruling is limited to the admissibility of grand jury testimony. It is undeniable, and in fact conceded by the government, that grand jury testimony constitutes "former testimony" specifically covered by Rule 804(b)(1).

**6.** For an excellent discussion of the legislative history of Rule 804(b)(1) and Rule 804(b)(5) see Weissenberger, *The Admissibility of Grand Jury Transcripts: Avoiding the Constitutional Issue,* 59 Tulane L.Rev. 335 (1984).

**7.** It is the government's position that "[t]he threshold question" in admitting grand jury testimony under Rule 804(b)(5) "is whether the statement has equivalent guarantees of trustworthiness". *See* Government's Memorandum in Support of Motion for Reconsideration at 6. The emphasis in Rule 804(b)(5) is on "equivalent" circumstantial guarantees of trustworthiness. As one commentator asks: "... if another section of rule 804(b) expressly states that the requisite guarantee of trustworthiness for former testimony is the opportunity for cross-examination, how can prior testimony not so tested ever be viewed as sufficiently trustworthy?". Burstein, *Admission of an Unavailable Witness' Grand Jury Testimony: Can It Be Justified?,* 4 Cardozo L.Rev. 263, 269 (1983).

ger, *The Admissibility of Grand Jury Transcripts: Avoiding the Constitutional Issue,* 59 Tulane L.Rev. 335, 342 (1984); *see Burstein, Admission of an Unavailable Witness' Grand Jury Testimony: Can It Be Justified?,* 4 Cardozo L.Rev. 263, 268 (1983).

This court rejects the governments' invitation to tolerate such a derogation of Rule 804(b)(1) by admitting grand jury testimony under Rule 804(b)(5). To hold otherwise would result in a "major judicial revision" of Rule 804(b)(1), contrary to the Third Circuit's admonition in *United States v. Bailey, supra,* at 1504; *see also United States v. Thevis,* 665 F.2d 616, 629 (5th Cir.), *cert. denied sub nom Evans v. United States,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982) ("Corroborated grand jury testimony which for one reason or another is unavailable at trial is neither rare nor exceptional, and in our opinion its general admission under this theory would constitute a 'major revision' of the hearsay rule ...").

■ Use of Rule 804(b)(5) to admit grand jury testimony violates both the requirement that residual exceptions be applied only in unanticipated situations and the requirement that use of the residual exception not undermine the purpose of the existing rules. For this reason, the court concludes that admission of grand jury testimony under Rule 804(b)(5) is a perversion of the Federal Rules of Evidence and should not be condoned.[8]

## B. *Application of Rule 804(b)(5)*

■ Even if this court were to adopt the government's theory and accept Rule 804(b)(5) as a vehicle for admitting grand jury testimony, this court would exclude the proffered testimony. Conceding the materiality and probativeness of the testimony offered, Rule 804(b)(5)(A)–(B), this court nevertheless concludes that there are insufficient circumstantial guarantees of trustworthiness to warrant admission of the grand jury testimony under Rule 804(b)(5). *See* Defendants' Brief in Opposition, at 23, footnote 6.

The government offers the following as indicators of reliability:

1. Rodriquez's statements were made under oath, subject to the penalty of perjury. *See United States v. Carlson, supra.* The government goes on to argue that Rodriguez's immunity agreement with the government was contingent on his being truthful, such that Rodriguez had every incentive to be truthful. *See* Grand Jury Transcript, Exhibit A at 7.[9]

The fact that a witness testified under oath before a grand jury and then again before a trial jury could never serve as a basis for denying the right to cross-examine a witness and challenge his credibility. *See United States v. Gonzalez, supra.* The fact that the witness is unavailable should give the taking of the oath no greater effect than if the witness were present. If the witness were present the fact that he had testified previously under oath would normally be utilized to attack rather than enhance his credibility.

While it is undisputed that Rodriguez gave his testimony under oath, it is also true that his testimony consisted of little more than "yes" and "no" responses to leading questions posed by the prosecutor. The lack of specific detail, and the suggestiveness of the leading questions all undermine the reliability offered by the require-

---

8. The court's holding that grand jury testimony is *per se* inadmissible under the residual exception, Rule 804(b)(5), may be subject to exception where it is determined, by a preponderance of the evidence, that the declarant's unavailability is directly attributable to misconduct on the defendant's part. Under these circumstances, the defendant may be precluded from raising any objection to the admission of the grand jury testimony as a result of having caused the witness' unavailability. *See e.g. United States v. Mastrangelo,* 693 F.2d 269, 273 (2nd Cir.1982) *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81

L.Ed.2d 343 (1984); *United States v. Thevis, supra; Weissenberger, supra,* at 351, n. 52.

9. The following are relevant excerpts from the grand jury transcript at page 7:

Q: "Do you also understand that as part of your agreement with the government your testimony must be completely truthful? A: Yes. Q: Do you understand that if it is not truthful, if it is found to be false, then your agreement with the government will be deemed null and void; do you understand that? A: Yes."

ment of an oath. Dissenting from the denial of certification in *United States v. Garner*, 574 F.2d 1141 (4th Cir.1978), Justices Stewart and Marshall wrote, "... that evidence was given before a grand jury adds little to its reliability. In grand jury proceedings, the ordinary rules of evidence do not apply. Leading questions and multiple hearsay are permitted and common". 439 U.S. 936, 938, 99 S.Ct. 333, 335, 58 L.Ed.2d 333 (1978).

Furthermore, defendants argue that contrary to the government's assertion, Rodriguez did have reason to lie. Defendants base their argument on the fact Rodriguez had a long criminal history and in fact, immediately prior to effectuating his cooperation agreement with the government, had been convicted for possession of drugs. In order to avoid having to serve time on these offenses, defendants' suggest that Rodriguez made a deal with the state to help in their drug enforcement program.[10] It is defendants' contention that Rodriguez would have done almost anything, including offering up "an innocent dupe" in order to "be free of his troubles with the criminal law".

Whether or not defendants' hypothesis is true, Rodriguez's true motivation is a relevant factor in this court's determination of "reliability" and admissibility of his grand jury testimony. It is a fact that if Rodriguez, an immunized informer, had testified at trial, the court would have been able to instruct the jury to examine and weigh his testimony "with greater care than the testimony of an ordinary witness". 1 Devitt and Blackmar, *Federal Jury Practice and Instructions*, Section 17.02, 17.04 (3rd ed. 1977). Where the court is unsure of the declarant's true motivation, the court should be reluctant to admit declarant's testimony as a Rule 804(b)(5) exception.

2. The government argues that Rodriguez testified with respect to matters about which he had first hand knowledge, rendering his testimony more reliable than if he were reporting secondary information and minimizing the possibility of faulty recollection. *See United States v. Carlson, supra.*

This argument makes little sense, since testimony reporting secondary information rather than first hand knowledge would not be admissible in any event.

3. Relying on the holding in *United States v. West, supra,* the government asserts that Rodriguez's testimony is corroborated by the debriefings he gave the FBI as the events were unfolding, which the FBI agents memorialized in official reports. The government's point is that the contemporaneous nature of Rodriguez's statements to the FBI and their substantive consistency over time demonstrate their reliability.

Defendants challenge the merit of this argument. First, the internal consistency of Rodriguez's information adds little to the reliability inquiry, since it would have been just as simple for Rodriguez to fabricate a lie and repeat it, as to tell the truth throughout.

Second, the fact that Rodriguez offered contemporaneous statements to the FBI does not substantiate the allegation that the information Rodriguez offered originated from Vigoa. In other words, it is just as plausible that Rodriguez had this information because he himself had masterminded the importation scheme, and at some point decided to sacrifice the scheme in exchange for a reprieve on his convictions. The FBI reports are nothing more than a codification of Rodriguez's story, and therefore can only be as accurate and truthful as Rodriguez was.[11]

---

**10.** The exact terms of Rodriguez's agreement with the government are unclear. The grand jury testimony indicates that Rodriguez would not be prosecuted for any information which he gave to the government in the course of his testimony. Defendants though note that at the time of his death, Rodriguez had not yet surrendered on an earlier Graves Act conviction and was out on bail for his subsequent cocaine and weapons indictment, suggesting that there was greater inducement than the government implies.

**11.** In its motion for reconsideration the government again argues that the timing of Rodriguez's disclosures to authorities is of critical significance in establishing their reliability. Describing Rodriguez's prior notice to FBI agent Robert DeBellis concerning an upcoming meeting with Vigoa on the night of March 21, 1986, and his prompt recounting of the meeting's substance, the government asserts that "there was no possibility that Rodriguez invented a story to conform with facts that had already transpired".

4. The government relies on corroboration provided by the observations of FBI agents to establish circumstantial guarantees of trustworthiness. For example, in March 1986, Rodriguez reported that Vigoa had informed him that a 20 foot sea container would soon arrive bearing 600 kilograms of cocaine in a hidden compartment. Customs inspectors, who had no knowledge of Rodriguez's statements to the FBI, discovered the container at Port Elizabeth thus verifying the accuracy of Rodriguez's information.

Similarly, Patino's name appeared on the travel documents, corroborating Rodriguez's testimony that Patino was the man Vigoa mentioned would call seeking storage space in Rodriguez's salvage yard. Finally, on March 22, 1986 the FBI witnessed Vigoa and the other defendants arrive at Rodriguez's salvage yard confirming Rodriguez's description of Vigoa's plan.

■ Corroborative evidence is only relevant if it goes to the incriminating portions of the testimony. *See United States v. Turner*, 475 F.Supp. 194, 203 (E.D.Mich. 1978). The government seeks to introduce the grand jury testimony to demonstrate Vigoa's role in the importation scheme. Yet up until March 22, 1986, there is no objective corroboration that Vigoa was directly involved in supplying Rodriguez the pertinent information.

The flaw in the government's proffer of this surveillance corroboration is that it verifies objective, non-incriminating incidents, none of which directly implicate Vigoa unless the trier of fact believes Rodriguez's allegation that he learned of their occurrence from Vigoa. The existence of the sea container, and the appearance of Patino's name on the travel documents, do not independently confirm Vigoa's participation. Rodriguez's statement that Vigoa was behind these events is critical, and uncorroborated.

There were no observations of any conversations between Rodriguez and Vigoa prior to Vigoa's March 22, 1986 appearance at the salvage yard. While Rodriguez did give FBI agent Robert DeBellis prior notice of a meeting he was to have with Vigoa during the evening of March 21, 1986, a meeting for the ostensible purpose of planning the next day's cocaine unloading, this meeting was neither observed nor tape recorded. *See* DeBellis Affidavit, dated 2/10/87. According to Rodriguez, it was at this meeting that Vigoa informed him that he and the "people from New York" would come to unload the container the next day. *Id.*

Observations of Vigoa at the salvage yard on March 22, 1986, at the time the cocaine was being unloaded most strongly corroborate the government's allegation that Vigoa was connected with the importation scheme. Vigoa was seen to arrive in a car with the other named defendants.[12] Immediately following their arrival, the process of unloading the van was initiated. Nevertheless, as the government concedes, at the time that FBI agents entered the salvage yard, Vigoa was not anywhere in or near the sea container. When questioned about his presence later that day, Vigoa explained that he had come looking for replacement doors for his car, an explanation verified by the recent testimony of Felix LaBoy. *See infra* at 1508–09.

Recognizing that the March 22, 1986 observations enhance the reliability of Rodriguez's testimony, the court, considering the record as a whole and finding nothing outside this single observation to provide "circumstantial guarantees of trustworthiness" must conclude that this isolated cor-

---

*See* Government's Brief in Support of the Motion for Reconsideration, at 10.

This assertion overlooks the court's concern that absent a tape recording of the conversation between Rodriguez and Vigoa on that night, there is no corroboration that the information alleged to have been communicated was in fact communicated, or that the information originated with Vigoa.

**12.** The court had originally understood Rodriguez's grand jury testimony to suggest that Vi-

goa arrived alone in a car, separate from the "New York" van and conceivably for a different purpose than the other defendants. Upon the government's representation that FBI agents observed Vigoa arrive together with Montesions and Torres at the same time as Caro arrived in the van, the court retracts its earlier findings. *See* Government's Memorandum of Law in Support of Motion for Reconsideration.

roborative incident is insufficient to satisfy the reliability requirement imposed by Rule 804(b)(5).

5. In addition, the government relies on the statement of Felix Laboy, an employee at the salvage yard, given in response to the FBI questioning on March 22, 1986. Laboy testified that he had been working in the salvage yard trailer doing some plumbing work when Vigoa approached him and asked him if he wanted to make some money by unloading the container. *See* FBI Report, Exhibit D. The government asserts that Laboy's testimony corroborates Rodriguez's allegation that Vigoa orchestrated and supervised the cocaine smuggling scheme.

Yet, as argued by defendants in their brief, Laboy has since then amended or partially recanted his testimony. *See* Defendants' Brief in Opposition, Exhibit 9. On December 6, 1986, interviewed by Adam Mangino, a drug enforcement expert retained by defendants' counsel, Laboy stated that Rodriguez, not Vigoa, had enlisted him to unload the container. *See* Exhibit 9, at page 4. Laboy went on to say that "Vigoa was in the back of the yard somewhere. Looking for a door, as far as I know". *Id.*

The contradictory versions of Laboy's story detract from its usefulness as corroboration for Rodriguez's testimony, and therefore cannot be presumed to enhance the guarantee of trustworthiness. It will be for the jury to decide which version is the truth. This court cannot arbitrarily rely on the earlier version for the purposes of admitting Rodriguez's testimony.

6. Last the government refers to the tape recordings of conversations between Rodriguez and Vigoa in late May 1986, in which Vigoa is said to admit having knowledge of the cocaine, thus further bolstering Rodriguez's testimony.[13]

Defendants argue that any knowledge of cocaine expressed in these conversations which took place between May 29 and June 2, 1986, more than three months after the container was delivered, was learned as a result of the FBI questioning which took place March 22, 1986 at the salvage yard. At that time the FBI agents told the defendants that they were investigating a cocaine operation. The government counters by noting that the FBI never let on that they knew the cocaine had come in the container in question, such that any confession by Vigoa revealing knowledge that the cocaine had been hidden in the container, was independently derived and implies Vigoa's knowledge of and participation in the scheme. *See* Reply Brief at 20.[14]

Reviewing the totality of the evidence presented by the government as establishing "circumstantial guarantees of trustworthiness", this court is not persuaded that they are sufficient to warrant admission of Rodriguez's grand jury testimony under Rule 804(b)(5).

The very fact that the testimony was sworn to before a grand jury adds little to the determination of trustworthiness since Rodriguez's testimony consists of nothing more than mono-syllabic responses to leading questions. The only corroborating witness, Felix Laboy, has recanted that part of his testimony that would have corroborated Rodriguez's allegations against Vigoa. And finally, none of the FBI observations, with the possible exception of their observation of Vigoa at the salvage yard on March 22, 1986, directly link Vigoa to the cocaine scheme.

Accordingly, the court concludes that Rodriguez's testimony is not admissible under Rule 804(b)(5). Moreover, the court notes that even if it were inclined to find that the grand jury testimony was properly a hearsay exception; the constitutional infringement its introduction would work against the defendant Vigoa, compels its exclusion.

## II. *Confrontation Clause*

Admission of Rodriguez's grand jury testimony would deny defendants their rights

---

**13.** These are the same tapes which are the subject of defendants' motion *in limine.*

**14.** Vigoa makes some mention of the fact that he has tried to enlist the help of an attorney in retrieving the container now in holding by the "feds" but that the attorney is charging too much because "he knows whats in it". *See* Government's Reply at 22.

under the Confrontation Clause of the Sixth Amendment to the Constitution. That Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....".

■ The Confrontation Clause requires that a defendant be permitted to face his accusers, and more importantly, requires the accusers to face the defendant. It was meant to prohibit criminal prosecutions and convictions by secret informants.

In practice witnesses must speak their accusations in the presence of the defendant and be subjected to cross-examination. A person is more apt to tell the truth if required to point the finger of accusation directly at the accused; and the truth is more likely to emerge if that accusation can be tested through the rigors of cross-examination.

The opportunity to confront witnesses not only promotes the perception of fairness engendered by having the accused and accuser engage in an open and even contest in a public trial, *Lee v. Illinois,* —— U.S. ——, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), but also permits the jury to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility. A large part of most criminal trials is devoted to the cross-examination of witnesses who have entered into plea bargains and hope to lessen their punishment by cooperating. It is difficult to imagine how that challenge to credibility can be accomplished absent the presence of the witness.

■ There may be witnesses whose independence and integrity is so clear, and testimony so reliable that their absence can be deemed not to prejudice a criminal defendant or violate his rights.

But a confessed criminal, an admitted accomplice, must be subject to cross-examination except in the most extraordinary circumstances, and even they are difficult to envision. Even to place in evidence all that could be used for cross-examination purposes is not sufficient. Defense counsel must be able to ask the accusing witness in essence whether he would lie to keep from going to jail. No independent evidence, no closing argument of counsel, can substitute for that opportunity. What the witness responds and how he responds can be the difference between conviction and acquittal.

■ The right to have the accuser face the accused, the right to test the accusation through cross-examination, and the right of the jury to judge the accuser's credibility by observing his demeanor are the foundation of the Confrontation Clause. They should not be lightly set aside.

■ Admitting the testimony of an unavailable witness creates a *per se* violation of the Confrontation Clause. Nevertheless, just as a trial court tolerates "harmless" constitutional error in post-trial judicial review, so too courts have come to tolerate infringements of the Confrontation Clause by admission of un-examined testimony where certain mitigating conditions exist. Yet, acknowledging that the admission of such testimony is undeniably an intrusion upon the defendant's Sixth Amendment right, there should be a strong presumption against such admission in a criminal trial.

■ The Supreme Court has determined that a court may tolerate an intrusion upon the defendant's right of confrontation and permit admission of un-examined testimony which "bears sufficient guarantees of reliability and [where] the circumstances contain a sufficient basis upon which the jury may assess its trustworthiness", *United States v. Garner, supra,* at 1144. Nonetheless, it is this court's strongly held belief that where the testimony sought to be introduced is the most probative piece of incriminatory evidence, the substantial risk of prejudice to the defendant from the inability to cross-examine compels the exclusion of the testimony. "[F]aithfulness to the constitutional principle demands the exclusion of all extrajudicial declarations having no substantial indicia of reliability if admission of the declaration would have some tendency to persuade the jury to a finding of guilt". *United States v. West, supra,* at 1138.

Where, as here, the proffered statement constitutes the "crucial and devastating" evidence against defendant, *Dutton v. Evans, supra,* at 82, this creates an almost irreconcilable tension between the government's need to have the statement admitted and the defendant's interest in its exclusion. If the statement is not admitted, the government's case may be so weakened that it will not survive a Rule 29 motion for judgment of acquittal. However, the defendant's right to Sixth Amendment protection and his interest in exercising the opportunity to confront are also most compelling where the testimony sought to be admitted may make the difference between conviction and acquittal. The court is faced with the difficult task of balancing these competing interests.

Other courts have resolved this conflict by simply requiring a higher threshold showing of corroboration and indicia of reliability. *See e.g. Dutton v. Evans, supra; see also United States v. Barlow, supra,* (where the proffered statement provides "direct evidence of guilt or critical proof of guilt", substantial corroborating evidence must "weigh heavily in favor of admissibility"). The court finds this solution inadequate for the following reason. If the government is able to make a particularly "substantial" and comprehensive showing of corroborative evidence, this greatly minimizes the need to infringe upon the Confrontation Clause and admit the testimony of an unavailable witness. The government can rely on the abundant corroborative evidence to establish its proof before the trier of fact. Rule 804(b)(5) itself requires that the proffered statement be most "probative on the point for which it is offered than any other evidence". Where substantial other corroborating evidence exists, it becomes increasingly unlikely that

the unavailable declarant's testimony is the most probative evidence on point.

While this court does not endorse a rule that would require the *per se* exclusion of declarations by an unavailable witness whenever the proffered testimony provides "direct evidence of guilt", the court imposes a stringent presumption against admission of such evidence and recognizes a need for careful case-by-case analysis. The court believes that the tension between the government's need for the evidence and the defendant's Sixth Amendment right is best resolved by imposing the burden of an adverse presumption upon the government.[15]

In conclusion, where the proffered statement is the most incriminating evidence being offered against a defendant in a criminal trial, the onus is on the court to carefully analyze the specific circumstances surrounding the testimony and to afford the defendant maximum protection against the invasion of his Sixth Amendment rights.

 Therefore the declarations of an unavailable witness should only be admitted under special and compelling circumstances in a criminal trial. The standards for determining whether testimony bears "sufficient indicia of reliability" for purposes of avoiding confrontation clause violations must be distinct from the "circumstantial guarantees of trustworthiness" analysis engaged in for purposes of Rule 804(b)(5). In determining whether or not to admit such evidence the court should consider the following factors:

1) the circumstances under which the statement was given and the extent to which it is the witness' own account;

---

**15.** The court is cognizant of the inherent tension between Rule 804(b)(5)'s requirement that the proffered statement be the most "probative on the point for which it is offered" and its finding that where the statement is the most probative piece of incriminatory evidence in a criminal trial, there should be a strong presumption against its admission. The court reconciles this by noting first that Rule 804(b)(5) applies to civil as well as criminal trials. It is only in criminal trial where the Sixth Amendment concerns must shape the court's analysis in which

this conflict arises. Second, the court strongly believes that there is a qualitative distinction between relying on Rule 804(b)(5) to introduce probative evidence of a tangential issue and relying on 804(b)(5) to seek admission of a statement that is the most critical, direct evidence of guilt against a criminal defendant. In the latter situation, interests of fairness and the defendant's Sixth amendment interest so overwhelm any prosecutorial interest, that precisely because the statement is so probative of guilt, it must be excluded.

2) the manner in which the statement was recorded or memorialized;

3) any pressures, physical or psychological, which were exerted upon the witness which might affect his motive to lie or tell the truth;

4) the opportunity, if any, to cross-examine or otherwise test the reliability of the witness;

5) the character of the witness for truthfulness and honesty and the availability of evidence on the issue;

6) the indicia of reliability of the statement by corroboration or other factors outside of the statement itself;

7) how necessary the statement is to the prosecution and how incriminating it is to the defendant; and

8) whether either party caused or procured the unavailability of the witness.

 Where, as in this case, the indicia of reliability are suspect, and where there is little substantive information upon which the jury can assess Rodriguez's credibility, there is no foundation warranting an exception to a right as fundamental as the right to cross-examine.

Particularly where, as here, the outcome of the trial will depend to a great extent on the contest between Vigoa's credibility and that of Rodriguez, and where a critical witness, Felix Laboy, has now directly challenged the veracity of Rodriguez's testimony, the inability to cross-examine Rodriguez creates such prejudice as to require its exclusion. Rodriguez's scant testimony has never been probed in any rigorous, truth-seeking manner. To deny defendants the opportunity to conduct such a probe creates gross unfairness, particularly where Rodriguez's testimony is the only significant evidence which exists to incriminate Vigoa.

Considering the substance of Rodriguez's testimony, it would be enormously prejudicial to admit such evidence without granting defendants the opportunity to cross-exam.[16]

For all the reasons set forth above, the government's motion is denied.

### ORDER

This matter having originally been opened to the court upon the government's application to admit the grand jury testimony of Orestes Rodriguez, a recently deceased government witness; and the court having denied the government's motion as violative of both the federal Rules of Evidence and the Confrontation Clause by Order, filed February 20, 1987 and Opinion filed March 6, 1987, and the government now having moved for reconsideration of the court's Order and the court having heard oral argument on the motion and having considered the additional submissions, for good cause showing,

IT IS this 27 day of March, 1987 hereby

ORDERED that the court's Order filed February 20, 1987 and Opinion filed March 6, 1987 be and hereby are, vacated and it is further

ORDERED that the government's motion seeking admission of the grand jury testimony is denied for the reasons set forth in the accompanying Amended Opinion filed this day.

---

**16.** Under Rule 806 of the Federal Rules of Evidence, defendants would be able to offer impeaching evidence to attack Rodriguez's testimony. Nevertheless, its impact would be so reduced and its effectiveness so jeopardized by Rodriguez's absence, that this court concludes that it is inappropriate to admit the testimony in the first instance.